OPINION
Plaintiff-appellant Board of Township Trustees of Washington Township, Richland County, Ohio, appeals from the May 23, 2000, Judgment Entry of the Richland County Court of Common Pleas.
 STATEMENT OF THE FACTS AND CASE
Appellees Jeffrey L. Grogoza and William A. Grogoza are the lawful owners of seven parcels of land and an adjoining three-fourths of an acre located in Washington Township in Richland County. All of the parcels, which include Lots 11 through 16, are located in a residential R-1 district. All parties agree that appellees' predecessor in title, Marion Lutz, was granted a variance for Lots 15 and 16 to construct a garage for truck storage and that the variance extends to appellees. On November 23, 1998, appellant Board of Township Trustees of Washington Township filed a complaint for declaratory judgment against appellees in the Richland County Court of Common Pleas. Appellant, in its complaint, alleged that appellees used their property for keeping, parking and storing old and used motor vehicles, equipment and miscellaneous items and that such use was not in accordance with zoning resolutions. Appellants specifically requested the trial court "to declare the lawful zoning status of Defendants' [appellees'] property . . . and the legal right to Defendants to continue their current use of their property and the legal right of Plaintiff [appellant] to apply and enforce its zoning resolution to Defendants' property . . ." An answer was filed by appellees on January 5, 1999. Thereafter, appellant, on May 3, 1999, filed a Motion for Summary Judgment, arguing that appellees' use of the lots, with the exception of Lots 15 and 16 which were subject to the variance, violated appellee's R-1 residential zoning. Appellees, in turn, argued in their response that their use of the subject property was a non-conforming use which was in existence when the residential zoning was originally adopted and, therefore, was permissible. Subsequently, the trial court, as memorialized in a Judgment Entry filed on July 8, 1999, granted partial summary judgment in favor of appellant, holding that appellees' "storage of vehicles and materials violates the township zoning unless it is protected as a continuous nonconforming use." The trial court, in its entry, further held that appellant's Motion for Summary Judgment that appellee's use was not a protected nonconforming use was overruled because of factual issues. Thereafter, a bench trial was held before a Magistrate on October 8, 1999. The following evidence was adduced at the bench trial. In July of 1940, Marion Lutz, appellees' predecessor in title, became the owner of Lots 11-14 of Washington Village located in Washington Township along with an adjoining three-fourths acre tract of land abutting all four lots. During the years prior to 1957, Lutz operated a sawmill located on Lot 14 and "then through the summer months he done custom farming. He baled hay and custom thrashing." Transcript of Proceedings at 97. At trial, Richard Spohn, who had worked for Marion Lutz, testified that, during such time, Lutz had a number of vehicles and pieces of equipment parked outside on various parts of the property, including tractors, forklifts and hay balers. According to Spohn, Lutz also had stacks of lumber "setting around". Transcript of Proceedings at 98. In addition, during World War II, cars were parked on Lutz's property for ride sharing. Commencing in January of 1957, zoning regulations were enacted covering property located in Washington Township. The area including the Lutz property was zoned R-1 residential and is still zoned R-1 to date. Since Lutz's use of his property as a sawmill predated the enactment of the zoning regulations, such use was recognized as a nonconforming use. Subsequently, Marion Lutz, in 1960, purchased Lots 15 and 16, which are adjacent to and south of Lots 11-14. After his application for a zoning certificate to build a garage on Lots 15 and 16 to store the truck used in connection with his sawmill was denied, Lutz appealed such decision to the Washington Township Board of Zoning Appeals. Lutz, in his appeal, stated that Lots 15 and 16 "would not be suitable for residential purposes. They adjoin my nonconforming business area." Transcript of Proceedings at 74. In November of 1964, Lutz received a variance on such lots to construct a garage. After the variance was granted, a new cement block garage building was constructed on Lots 15 and 16. According to Richard Spohn, after the block garage was completed, Lutz continued parking vehicles, including tractors and trucks, outside. Lutz continued operating the sawmill on his property until approximately 1971 or 1972. In 1973, he leased the cement block building to Lloyd Turner for the operation of an auto body shop. When asked at trial how the Lutz property was after Turner came onto the property, Spohn responded as follows: "Well, about the same thing. He still had the slabs, the mill stuff was still there and Turner, or they had cars in there." Transcript of Proceedings at 102. Spohn further testified that Lutz used part of the property during such time. Turner operated the body shop until 1985. During the time the body shop was in operation, Turner, in addition to using the cement block building on Lots 15 and 16, "parked his vehicles wherever he saw fit to park the vehicles." Transcript of Proceedings at 149. In May of 1985, Marion Lutz transferred Lots 11 through 16 along with other land to appellees, his grandsons. Commencing in the early 1980's, appellee Jeffrey Grogoza, who operates a business that rents out commercial real estate, began storing equipment, including a ton and a half dump truck outside, on the Lutz property. At trial, appellee Jeffrey Grogoza testified that he used all of the lots and acreage, not just Lots 15 and 16, and that all of the lots and acreage comprising the Lutz property have been used for business purposes since the early 1970's. After the conclusion of the trial, both parties filed briefs. Thereafter, the Magistrate, pursuant to a decision filed on March 7, 2000, recommended that appellees be permitted to continue their current use of the property. The Magistrate found, in part, that there had been no changes of the nonconforming use of the Lutz property. Appellant, on March 21, 2000, filed objections to the Magistrate's Decision. Subsequently, the trial court, as memorialized in a Judgment Entry filed on May 23, 2000, overruled appellant's objections and affirmed the Magistrate's Decision to which appellees filed a reply on March 24, 2000. The trial court, in such entry, stated, in part, as follows: The parties agree that the subject property was already being used for nonconforming uses at the time it was zoned in 1957. The magistrate held the burden of proof was on the plaintiff township trustees to prove that the nonconforming use of the subject property had been abandoned for at least two years. Based on his weighing of the evidence, the magistrate concluded plaintiff failed to meet its burden of proof. Plaintiff's objections basically quarrel with the magistrate's factual findings. The magistrate found in sum that throughout the period from 1957 to the present the property was continually used for small businesses — all of which involved the storage on the subject property of lumber or other building material and vehicles and equipment. Apparently, the only significant addition of a building on the premises was done pursuant to a variance granted by the township. There is support for the magistrate's conclusion that the township failed to meet its burden of proof in the testimony of Richard Spohn and Jeff Grogoza. The plaintiff's objections should accordingly be overruled.
It is from the trial court's May 23, 2000, Judgment Entry that appellant now prosecutes its appeal, raising the following assignments of error:
 ASSIGNMENT OF ERROR I 1. WHETHER R.C. 519.19 REQUIRES A TOWNSHIP TO SHOW EXACT DATES OF ABANDONMENT OF NONCONFORMING USES IN ORDER TO PREVAIL.
 2. WHETHER A NONCONFORMING USE CAN BE CONSIDERED TO CONTINUE BASED ON THE SAME OWNER'S LAND USE ON AN ABUTTING PARCEL.
 3. WHETHER A NONCONFORMING USE CAN BE CONSIDERED TO CONTINUE BASED ON THE SAME OWNER'S UNLAWFUL USE OCCURRING ON AN ABUTTING PARCEL.
 ASSIGNMENT OF ERROR II 4. WHETHER ANCILLARY USES OF AN ORIGINAL NONCONFORMING USE PERMIT THE SUBSTITUTION OF AN UNRELATED NONCONFORMING USE.
 5. WHETHER R.C. 519.19 PERMITS THE DISCONTINUANCE OF ANCILLARY USES FOR MORE THAN TWO YEARS IN ORDER TO CONTINUE LAWFUL NONCONFORMING ISSUES.
 6. WHETHER R.C. 519.19 PERMITS ANCILLARY USES OF DIFFERENT NONCONFORMING USES TO BE CONSIDERED FOR PURPOSES OF SUBSTITUTION WITHOUT CONSIDERATION OF WHETHER THE SUBSTITUTION IS MORE OR LESS RESTRICTIVE WHEN COMPARED TO THE ORIGINAL NONCONFORMING USE.
 ASSIGNMENT OF ERROR III 7. WHETHER R.C. 519.19 AND THE WASHINGTON ZONING RESOLUTION PERMIT THE SUBSTITUTION OF A NONCONFORMING USE TO ANY OTHER USE THAT FALLS WITHIN THE SAME CATEGORY OR CLASSIFICATION UNDER THE ZONING RESOLUTION.
 I
Appellant, in its first assignment of error, argues that the Magistrate erred in holding that appellant had the burden, under R.C. 519.19, of showing the exact date of abandonment of the original nonconforming use of the property. R.C. 519.19 states, in part, as follows: The lawful use of any dwelling, building, or structure and of any land or premises, as existing and lawful at the time of enactment of a zoning resolution or amendment thereto, may be continued, although such use does not conform with such resolution or amendment, but if any such nonconforming use is voluntarily discontinued for two years or more, any future use of said land shall be in conformity with sections 519.02 to 519.25, inclusive, of the Revised Code. (Emphasis added). Section 5, paragraph 1 of the Washington Township Zoning Resolution states as follows: "[a] non-conforming use existing at the time the zoning resolution takes effect may be continued, except that if it is voluntarily discontinued for two (2) years or more, it shall be deemed abandoned. . . ." Appellant now specifically contends both that the nonconforming use of the property as a sawmill was voluntarily discontinued for two years or more and that appellant did not have the burden of proving the exact date of such discontinuance. "In order to show a voluntary discontinuance of a nonconforming use, a party opposing the use must demonstrate that there has been a manifest intention to abandon the nonconforming use." Bd. of Trustees of Williamsburg Twp. v. Kriemer (1991), 72 Ohio App.3d 608,612. Thus, since appellant in this matter opposes the nonconforming use, the burden of proof would rest on appellant. We concur with the trial court that appellant has failed to show that there was a voluntary abandonment of the nonconforming use of the property for small businesses involving storage on the subject property of lumber or other building materials and vehicles and equipment, for a period of two years pursuant to R.C. 519.19. At the trial in this matter, Richard Spohn testified that, prior to the enactment of zoning in 1957, the Lutz property was used for the operation of a sawmill, for custom farming and thrashing and for baling hay. Spohn further testified that, during such time, Marion Lutz kept lumber, various pieces of equipment and vehicles all over the property. Testimony was also adduced at trial that, after Lloyd Turner began operating a body shop, "[n]othing changed very much." Transcript of Proceedings at 102. According to Spohn, "the mill stuff was still there and Turner or they had cars in there." Id. Furthermore, Spohn testified that he could not recall any time when the property was not used for some type of business. According to Spohn, from the 1940's to the present, there have been a number of vehicles parked and stored on the property and the condition of the property has not changed. In addition, at trial, appellee Jeffrey Grogoza, Lutz's grandson, testified that all of the Lutz property, not just Lots 15 and 16, has been used continuously for business purposes since the early 1970's. The following is an excerpt from his testimony at trial: Q. What vehicles and equipment were in the property in the 1970's? A. My grandfather still had tractors, but tractors he used in the mill business, not tractors you use in ag. Q. What tractors did he — — A. He had equipment, as far as a forklift, and a long truck I believe he still had in the 1970's. Q. Did he have a crawler loader? A. He had a crawler loader. I can't remember when he sold it. I know he had it in the 1960's. Q. How about a winch truck? A. It might have been there in the 1970's. I know it was there in the 1960's. Q. Was there lumber on the property in the 1960's? A. There's always been lumber stored on the property, always. Q. So it's your testimony he used all the property for storage, not just part? A. That's correct. Q. How about tires? A. Tires for what he needed them for in the tire business. Q. How many tires would be there at one time? A. I'm sure he had a spare for every truck he had, if not one or two. Q. Did Marion sometimes fix his own vehicle? A. Oh, yes. Q What equipment did he use to fix his own vehicles? A. What equipments? Q. Yes. A. He had, if he didn't have it he would go get it if that's what it took to get him back in business; welders, jacks, anything like that. Q. Did Marion sometimes store the vehicles and equipment outside the building in the 1970's? A. Oh, yes. Q. And did he sometimes store the stuff in the buildings? A. Oh, yes. Q. So the amount of vehicles on the property would vary from time to time? A. Yes. Q. Now, prior to Lloyd Turner taking over the property, taking over the block building what use did Marion make of the property? A. Before Lloyd Turner? Q. Yes. A. He still had his mill business going. I know he made pallets in the block building. The pipeline used the block building, along with the rest of the property. My grandfather used the block building along with the pipeline people. It wasn't a separate entity, the block building. It was always considered one piece of property, and that's how everyone used it. Q. Since the early 1970's have all the lots and acreage been used for business purposes? A. Yes, that's correct. Q. And it's not just been isolated to Lots 15 and 16? A. Absolutely not. Q. Has there been a two year period where the property was not used for business purposes since the 1970's? A. No. Q. Has there been any period? A. No. (Emphasis added.)
Transcript of Proceedings at 156-159. Appellee Grogoza, who operates a business that rents out commercial real estate, testified that he has stored equipment on the property since the late 1970's, early 1980's and that the property "was always used for a business, but it might not have been one business. It might have been consecutive businesses." Transcript of Proceedings at 159. In short, we find that there was competent and credible evidence in the record supporting the trial court's finding that "throughout the period from 1957 to the present, the property was continually used for small business — all of which involved the storage on the subject property of lumber or other building material and vehicles and equipment." We further find that appellant has failed to meet its burden of demonstrating that the nonconforming use of the subject property for use for small businesses was abandoned for a period of two years. Appellant's first assignment of error is, therefore, overruled.
 II
Appellant, in its second assignment of error, challenges the Magistrate's finding that "[e]ven though the primary use of the property today is not identical to that of the time of the sawmill in the sixties, the ancillary uses are the same." The Magistrate found the ancillary nonconforming uses to be the "storage of equipment, materials and related byproducts throughout the Lutz property." We agree with the Magistrate's Findings (adopted by the trial court). Appellant argues that the trial court has expanded the use of ancillary nonconforming uses beyond current Ohio law. Appellant argues that an ancillary nonconforming use cannot become a dissimilar primary nonconforming use when the original nonconforming use no longer exists. Appellant cites two cases to illustrate its argument. The earlier of those two cases is Union Limestone, Inc. v. Bumgarner Zoning Inspector (1959), 110 Ohio App. 173
. In Union Limestone, the court found that a primary nonconforming quarry operation could extend its operation by adding an office, and such office could be built even though its placement would violate the zoning requirement of a fifty foot set back from the road. The other case cited by appellant, and also cited by the trial court, is Isler v. Samsa (March 18, 1996), Stark App. No. 1995CA00133. This court in Isler found that a garbage transfer recycling station was a permissible ancillary use of an existing commercial garbage facility, and, therefore, the existing commercial garbage facility could be extended to include a garbage transfer recycling station. The trial court used language from Isler to draw the conclusion that Ohio courts have treated primary and ancillary nonconforming uses equally. Appellant argues that the trial court goes too far in drawing this conclusion from the cases cited. Appellant points out that in both Union Limestone and Isler, the underlying primary use was never changed, and, therefore, these cases do not stand for the proposition that an ancillary use can survive its original primary use to become a new primary nonconforming use. We agree with the result reached by the Magistrate (that an ancillary nonconforming use can continue as a nonconforming use beyond the expiration of the primary nonconforming use the ancillary use originally accompanied.) We agree even though we acknowledge that the cases cited do not directly address the issue in the case sub judice. We agree because we find that an ancillary nonconforming use is a nonconforming use of the land. In the case sub judice, a sawmill and a custom farming business were the primary nonconforming uses of the land. These businesses had vehicles, equipment and lumber setting about on the land. While the vehicles, equipment and lumber were ancillary to or in aid of the primary business being conducted on the land, the land was still being used for vehicles, equipment and lumber prior to the enactment of the zoning code. We, therefore, find that a nonconforming use which was originally ancillary to the primary nonconforming use of the land, can continue as a nonconforming use even after the primary nonconforming use has ceased to exist. In the case sub judice, the original primary use of the subject property was as a sawmill, Richard Spohn testified at the bench trial that the entire Lutz property was also used at the same time for the storage of equipment, materials and related by-products. Testimony was adduced that such ancillary nonconforming use of the property has continued, uninterrupted, to date. Thus, the Magistrate's findings are supported by competent and credible evidence. Appellant's second assignment of error is overruled.
 III
Appellant, in its third assignment of error, challenges the Magistrate's alternate conclusion that "[a]s an alternative reasoning for sustaining the use, . . . the defendant's [appellee's] present use of the property for his commercial real estate business is the substitution of an equally restricted nonconforming use under Section 5, paragraph 5 of the Washington Township Zoning Resolution." Based on our disposition of the second assignment of error, we find this assignment to be moot.
The judgment of the Richland County Court of Common Pleas is affirmed.
Edwards, J. Hoffman, P.J. and Milligan, V.J. concur